**NOT FOR PUBLICATION**

```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
```

ROBERT BROWN,                    :
                                       Civil Action No. 04-5614 (JBS)
          Petitioner,      :

     v.                    :     **OPINION**

WARDEN JOHN NASH,                :
et al.,
          Respondents.     :


**APPEARANCES:**

| | |
|---|---|
| Petitioner <u>pro se</u> | Counsel for Respondents |
| Robert Brown | Irene E. Dowdy |
| #42463-054 | Office of the U.S. Attorney |
| F.C.I. Allenwood Medium | 402 East State Street |
| Rt 15 | Suite 430 |
| White Deer, PA 17810 | Trenton, NJ 08608 |

**SIMANDLE**, District Judge

Petitioner Robert Brown, a prisoner previously confined at the Federal Correctional Institution at Fort Dix, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.[1]  The Respondents are the Federal Bureau of Prisons and Warden John Nash.

---

[1] Section 2241 provides in relevant part:

(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions.
(c) The writ of habeas corpus shall not extend to a prisoner unless-- ... (3) He is in custody in violation of the Constitution or laws or treaties of the United States ... .

## I. BACKGROUND

On March 30, 2000, Petitioner Robert Brown was sentenced in the United States District Court for the Southern District of New York to a term of imprisonment of 240 months, with three years of supervised release to follow.  Petitioner's anticipated release date is July 13, 2016.

In his Petition, Petitioner asks this Court to order Respondents to transfer him to placement in a community corrections center ("CCC") or home confinement, pursuant to 18 U.S.C. § 3621(b).  In his separate Memorandum in Support, Petitioner challenges the Respondents' decision not to employ him in the Federal Prison Industries.

Respondents have filed a motion to dismiss.  Respondents construe the CCC placement claim as a challenge to the former December 2002 policy, which they contend has become moot by the promulgation of new regulations which became effective on February 14, 2005.  Respondents contend that the Prison Industries claim is not a proper habeas claim, because it merely challenges the conditions of Petitioner's confinement.

In response, Petitioner clarifies his contention that the new regulations, which limit CCC placement to the last ten percent of a prisoner's sentence (not to exceed six months), are contrary to the intent of Congress as expressed in 18 U.S.C.

§ 3621(b). Thus, the CCC claim is not moot and Respondents' motion to dismiss this claim as moot will be denied.

## II.  ANALYSIS

A.  Jurisdiction

This Court has subject matter jurisdiction over the CCC placement claim in this matter pursuant to 28 U.S.C. § 2241(a) and (c) in that Petitioner challenges his custody, in this district, under the authority of the United States and in violation of the laws of the United States.  See United States v. Ferri, 686 F.2d 147, 158 (3d Cir. 1982), cert. denied, 459 U.S. 1211 (1983) (claims attacking the execution of a petitioner's sentence are properly brought under 28 U.S.C. § 2241).

Indeed, "Section 2241 of title 28 has long been recognized as the basis for challenging the execution of the sentence of a person in federal custody or a person sentenced for violating a federal criminal statute."  Zucker v. Menifee, 2004 WL 102779, *3 (S.D.N.Y. January 21, 2004) (citing Maleng v. Cook, 490 U.S. 488, 493 (1989) (per curiam)).  Additionally, this Court has the authority to compel the BOP to exercise its authority to select and designate a place for service of sentence.  See McCarthy v. Doe, 146 F.3d 118 (2d Cir. 1998).  Habeas corpus relief under 28 U.S.C. § 2241 is available to effectuate this authority to the extent that the prisoner is in any form of "custody" in this district.  See Hensley v. Municipal Court, 411 U.S. 345 (1973).

To the extent a prisoner challenges only his conditions of confinement, however, such claims must be raised by way of a civil rights action.  See Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002).  Thus, this Court lacks jurisdiction to hear Petitioner's Prison Industries claim under 28 U.S.C. § 2241, and Respondents' motion to dismiss this claim for lack of jurisdiction will be granted.[2]

B.   Statutory Language and the Changes in BOP Placement Policy

Federal law imposes upon the Bureau of Prisons the obligation and discretion to designate the place of a prisoner's imprisonment, as follows:

> (b) Place of imprisonment.--The Bureau of Prisons shall designate the place of the prisoners's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering -
>
>    (1) the resources of the facility contemplated;
>
>    (2) the nature and circumstances of the offense;
>
>    (3) the history and characteristics of the prisoner;
>
>    (4) any statement by the court that imposed the sentence-

---

[2] It is not appropriate to re-characterize this claim as a civil rights claim, as such a claim would be subject to an additional filing fee, screening pursuant to 28 U.S.C. § 1915, and a potential strike under 28 U.S.C. § 1915(g).

>> (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
>
>> (B) recommending a type of penal or correctional facility as appropriate; and
>
>> (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of Title 28.
>
> In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status.  The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another.

18 U.S.C. § 3621(b).

In addition, federal law provides that prisoners shall, to the extent practicable, serve the last portion of their imprisonment under conditions that will facilitate their transition from prison life to the community.

> (c) Pre-release custody.--The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community.  ...

18 U.S.C. § 3624(c).

In implementing pre-release custody programming under this statute, the BOP has traditionally used a variety of community-based programs, including CCCs, Comprehensive Sanctions Centers ("CSCs"), the Mothers and Infants Together ("MINT") program, and Intensive Confinement Centers ("ICCs"), as well as

5

home confinement.  BOP Program Statement ("PS") 7310.04, <u>Community Corrections Center (CCC) Utilization and Transfer Procedure</u> (Dec. 16, 1999), provides guidance to BOP staff as to the administration of pre-release programs generally.

Before December 2002, the BOP interpreted these statutes to allow the BOP to designate inmates to serve any or all of their terms of imprisonment in Community Corrections Centers.  The BOP also had a long-standing policy of considering prisoners for up to 180 days pre-release placement in a CCC, regardless of the length of sentence.

On December 13, 2002, the Office of Legal Counsel of the United States Department of Justice prepared a Memorandum Opinion for Deputy Attorney General Larry D. Thompson on the question "whether the BOP has general authority, either upon the recommendation of the sentencing judge or otherwise, to place [a federal offender whom the BOP deems to be low-risk and nonviolent and who has received a short sentence of imprisonment] directly in community confinement at the outset of his sentence or to transfer him from prison to community confinement during the course of his sentence."

The Office of Legal Counsel ("OLC") began its analysis with a review of Federal Sentencing Guidelines provisions addressing imprisonment and community confinement and federal court opinions concluding that community confinement does not constitute

6

"imprisonment" for purposes of these Sentencing Guidelines provisions.  The OLC progressed from this analysis to a determination that a community corrections center ("CCC") can not constitute a "penal or correctional facility" that may serve as a place of imprisonment within the meaning of § 3621(b).  If a CCC were considered a place of imprisonment within the meaning of § 3621(b), the OLC reasoned, "then the time limitation in section 3624(c) on BOP authority to transfer a prisoner to a non-prison site – i.e., for a period, not to exceed six months, of the last 10% of the term of his sentence – would be rendered null with respect to community confinement."  The OLC concluded that the practice, pursuant to the BOP's interpretation of § 3621(b), of placing certain prisoners in CCC for a period longer than that mandated by the specific language of § 3624(c) was not lawful.

   Based upon this OLC Memorandum Opinion, on December 16, 2002, Deputy Attorney General Larry D. Thompson sent a Memorandum to BOP Director Kathleen Hawk Sawyer advising her the that BOP's prior interpretation of § 3621(b) as including CCCs is unlawful and directing the BOP to cease placement of federal prisoners in CCCs except for the lesser of six months or ten percent of the sentence imposed on the offender.

   On December 20, 2002, the BOP adopted the OLC legal opinion in a memorandum mandating that "Pre-release programming CCC designations are limited in duration to the last 10% of the

7

prison sentence, not to exceed six months." This "ten-percent rule" represented a reversal of long-standing BOP policy to consider prisoners for pre-release CCC placement for up to the final six months of their sentences (the "six-months rule"), regardless of the total term of imprisonment. See, e.g., Schorr v. Menifee, 2004 WL 1320898, *2 (S.D.N.Y. June 14, 2004) (and cases cited therein). The new ten-percent rule was instituted without notice to the public and was not reflected in any BOP Program Statement. The new ten-percent rule generated a wave of litigation from federal prisoners seeking its invalidation on various grounds; federal courts addressing the issues raised in this litigation were sharply divided as to the validity of the new policy. Id. at *3 (collecting cases). See also Miranda v. Miner, Civil Action No. 04-2590(JBS) (D.N.J. Aug. 20, 2004) (finding the December 2002 policy invalid).

Responding to this division, on August 18, 2004, the BOP published proposed regulations regarding placement in CCCs or home confinement. See 69 Fed.Reg. 51213 (2004). Because numerous U.S. District Courts had held that a CCC is a "penal or correctional facility" within the meaning of § 3621(b) and that the BOP had discretion under 18 U.S.C. § 3621(b) to place offenders, sentenced to a term of imprisonment, into CCCs at any time during their imprisonment, the proposed regulations reflected an acquiescence in that statutory construction and a

8

determination how to exercise that discretion.  Specifically, the BOP determined to exercise its discretion categorically to permit designation of inmates to community confinement[3] only as part of pre-release custody and programming, during the last ten percent of the prison sentence being served, not to exceed six months, except where statutorily-created programs explicitly authorize greater periods of community confinement.

In the Federal Register, the BOP stated that it had considered the list of factors contained in § 3621(b), as well as other considerations, in reaching this decision.  The BOP identified as "most significant" the following factors: consistency in designating inmates to places of confinement; the resources of CCCs make them particularly well suited as placement options for the final portion of offenders' prison terms; policy determinations of the Sentencing Commission limiting confinement in CCCs; and the congressional sentencing policy, as reflected in § 3624(c), that pre-release transitional programming "exist" during the last ten percent of the prison sentence, not to exceed six months.  The BOP also considered the degree to which designation to a CCC could undermine the deterrent effect of imprisonment.

---

[3] "Community confinement" is defined to include community corrections centers (also known as "halfway houses") and home confinement.

Following a period for comment, the BOP issued final regulations on January 10, 2005, to become effective on February 14, 2005.[4]  70 Fed. Reg. 1659 (2005).  Several commenters expressed concern that the new rule "undermines the Bureau's statutory authority to make prisoner-specific determinations under § 3621(b)."  The BOP responded that "[t]he Bureau will continue to evaluate these factors when making individual designations to appropriate Bureau facilities, and this rule will not adversely affect such individualized determinations."  In response to the comment that the rule does not allow the Bureau to consider facility resources in making designation determinations, the Bureau responded that the "particular characteristics and advantages of CCCs ... make them best suited to particular inmates during the last ten percent of the prison sentence being served, not to exceed six months."  In addition, "[b]y ensuring that offenders sentenced to prison terms not be placed in CCCs except during the last ten percent of their prison sentences (not to exceed six months), the new rule will help ensure that CCCs remain available to serve the purposes for which their resources make them best suited."  Several commenters also

---

[4] During the comment period, two U.S. Courts of Appeals issued opinions finding that § 3621(b) authorizes the Bureau to place inmates in CCCs at any time during service of their prison sentence and that this authority is not limited by § 3624(c) to the last ten percent of the sentence being served. See Elwood v. Jeter, 386 F.3d 842 (8th Cir. 2004) and Goldings v. Winn, 383 F.3d 17 (1st Cir. 2004).

asserted that the rule is not consistent with the intent of Congress. Noting that several courts had held that the Bureau had discretion under § 3621(b) to place offenders sentenced to a term of imprisonment in CCCs at any time, the Bureau also noted that courts had acknowledged that the Bureau has discretion with regard to how it implements its mandatory pre-release obligation under § 3624(c), and stated that the Bureau considers it prudent to exercise its discretion in a manner to minimize the potential for disparity of treatment. Accordingly, with one minor change not relevant here, the BOP adopted the proposed rules as final.[5] See 28 C.F.R. §§ 570.20, 570.21.

C.   The Validity of the New Regulations

The new regulations have inspired a new round of litigation. Each Judge in the District of New Jersey who has had occasion to address the new regulations has found them to be valid. See Harris v. Federal Bureau of Prisons, 05-323 (RBK), 2005 WL 2562970 (D.N.J. Oct. 6, 2005); Jackson v. Federal Bureau of Prisons, 05-2339 (FLW), 2005 WL 1705775 (D.N.J. July 20, 2005); DeFrancesco v. Federal Bureau of Prisons, 05-1780 (FLW), 2005 WL 1712020 (D.N.J. July 20, 2005); Woodall v. Federal Bureau of Prisons, 05-1542 (FLW), 2005 WL 1705777 (D.N.J. July 20, 2005).

---

[5] To the extent the Petition could be construed as challenging the December 2002 police, the promulgation of 28 C.F.R. §§ 570.20 and 570.21 has mooted that claim. See Pimental v. Gonzalez, 367 F.Supp.2d 365, 372 (E.D.N.Y. May 3, 2005).

Decisions in other districts have resulted in mixed results. See, e.g., Moss v. Apker, 2005 WL 1593016 (S.D.N.Y. July 6, 2005)(new regulations represent a reasonable interpretation of § 3621(b), including consideration of all statutory placement factors, and do not increase punishment in violation of Ex Post Facto Clause); Levine v. Menifee, 2005 WL 1384021 (S.D.N.Y. June 9, 2005) (same); Pimentel v. Gonzalez, 367 F.Supp.2d 365 (E.D.N.Y. May 3, 2005) (new regulations are invalid because they improperly preclude consideration of the § 3621(b) factors in making placement decisions); Wiesel v. Menifee, 2005 WL 1036297 (S.D.N.Y. May 2, 2005) (finding that the new regulations are a lawful exercise of the Bureau's discretion, but that they violate the Ex Post Facto Clause with respect to prisoner convicted before the new rule went into effect);[6] United States v. Paige, 369 F.Supp.2d 1257 (D. Montana April 22, 2005) (BOP failure to consider the § 3621 factors in new regulations violates congressional intent and is an unreasonable interpretation of statutes at issue); Cook v. Gonzales, 2005 WL 773956 (D.Or. April 5, 2005) (regulations invalid because they do not permit consideration of the § 3621(b) placement factors); Yip v. Federal Bureau of Prisons, 363 F.Supp.2d 548 (E.D.N.Y. April 1, 2005) (new regulations valid exercise of discretion); Drew v. Menifee,

---

[6] Petitioner here does not allege a violation of the Ex Post Facto Clause.  Accordingly, this Court will not address that issue.

2005 WL 525449 (S.D.N.Y. March 4, 2005) (the new regulations are invalid because the Bureau's categorical exercise of discretion does not consider any of the factors that the Bureau is specifically required to consider by statute).

In 2001, the U.S. Supreme Court addressed a similar controversy involving the Bureau of Prisons interpretation and implementation of 18 U.S.C. § 3621(e)(2)(B), governing early release for successful completion of a drug abuse treatment program. See Lopez v. Davis, 531 U.S. 230 (2001).  The Bureau, and all courts to evaluate the new regulations, have cited Lopez in support of their positions.  Accordingly, a review of Lopez is instructive.

Federal law requires the BOP to make substance abuse treatment available for "each prisoner the Bureau determines has a treatable condition of substance addiction or abuse."  Section 3621(e)(2)(B) provides that  "[t]he period a [federal] prisoner convicted of a nonviolent offense remains in custody after successfully completing a [substance abuse] treatment program may be reduced by the Bureau of Prisons."  Initially, in Program Statement No. 5162.02, § 9 (July 24, 1995), because the statute explicitly confined the early-release incentive to prisoners "convicted of a nonviolent offense," the BOP excluded all prisoners convicted of a "crime of violence," which it defined to include, among others, a drug trafficking conviction under 21

13

U.S.C. § 841, if the offender had received a two-level sentence enhancement under United States Sentencing Commission, Guidelines Manual § 2D1.1(b)(1), for possessing a dangerous weapon during commission of the drug offense.

In the face of a circuit split over the validity of the BOP's definition of "crime of violence," the Bureau published a new regulation, which did not rely upon a definition of "nonviolent offense" or "crime of violence."  Instead, pursuant to the BOP's asserted statutory discretion to prescribe <u>additional</u> early release criteria, the BOP excluded specific categories of inmates, including those whose current offense was a felony "[t]hat involved the carrying, possession, or use of a firearm or other dangerous weapon."  <u>See</u> 28 C.F.R. § 550.58(a); 62 Fed.Reg. 53690-53691 (1997).

In <u>Lopez</u>, the Supreme Court upheld the BOP's exercise of its discretion through categorical exclusion of certain classes of prisoners from early-release eligibility.  The Court focused first on the statutory text, which instructs that the BOP "may" reduce the sentence of a nonviolent offender who has successfully completed a drug treatment program.  The Court found that Congress's use of the permissive "may" contrasted with its use elsewhere in § 3621 of "shall" to impose discretionless obligations, concluding that the BOP "thus has the authority, but not the duty, both to alter the prisoner's conditions of

14

confinement and to reduce his term of imprisonment." 531 U.S. at 241.

> The Court also noted that § 3621(e)(2)(B):
>
> has not identified any further circumstance in which the Bureau either must grant the reduction, or is forbidden to do so. In this familiar situation, where Congress has enacted a law that does not answer "the precise question at issue," all we must decide is whether the Bureau, the agency empowered to administer the early release program, has filled the statutory gap "in a way that is reasonable in light of the legislature's revealed design." We think the agency's interpretation is reasonable both in taking account of preconviction conduct and in making categorical exclusions.

Lopez, 531 U.S. at 242 (citing, inter alia Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 674 U.S. 837 (1984)[7] (other citations omitted). Moreover "the statute's restriction of early release eligibility to nonviolent offenders does not cut

---

[7] The standards set forth in Chevron govern a court's review of an agency 's construction of a statute.

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the courts, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue. the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Chevron, 467 U.S. at 842-43 (footnotes omitted).

15

short the considerations that may guide the Bureau."  531 U.S. at 243.

Rejecting the prisoner's argument that the BOP must exercise its discretion on the basis of case-by-case assessments, the Court held that "'[E]ven if a statutory scheme requires individualized determinations,' which this scheme does not, 'the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority.'  ...  The Bureau is not required continually to revisit 'issues that may be established fairly and efficiently in a single rulemaking proceeding.'"  531 U.S. at 243-44.  Having decided that the BOP could categorically exclude prisoners based upon their preconviction conduct, the Court further held the specific exercise of that discretion reasonable and permissible.  531 U.S. at 244.

Even the dissenters agreed that the BOP could adopt a uniform set of criteria for consideration in evaluating applications for sentence reduction and that dispositive, or near dispositive, weight could be given to certain criteria.  <u>See</u> <u>Lopez</u>, 531 U.S. at 726 (Stevens, J., with whom the Chief Justice and Justice Kennedy joined, dissenting).

Thus, it is clear that where Congress has granted the BOP authority to exercise discretion in implementing a statute, the BOP may rely on rulemaking to resolve issues of general

16

applicability "in a way that is reasonable in light of the legislature's revealed design."

Here, § 3621(b) sets forth a series of five factors to guide the BOP's exercise of discretion in making placement decisions. The BOP has explained that it considered those factors in promulgating the February 2005 Regulations and that it determined to give particular weight to certain factors in making its categorical determination that no prisoner will be considered for CCC placement prior to the final ten percent of his sentence, not to exceed six months.  This exercise of discretion is reasonable in light of the statutory design and falls within the Lopez rule. Thus, the regulations are valid.

### III. CONCLUSION

For the reasons set forth above, Respondents' motion to dismiss will be granted in part.  Petitioner's remaining claim challenging the validity of the February 2005 Regulations governing CCC placement will be denied.  Petitioner's motion for summary judgment will be denied.  An appropriate order follows.

 **s/ Jerome B. Simandle**
Jerome B. Simandle
United States District Judge

Dated:  November 23, 2005

17